
CLERK'S OFFICE
A TRUE COPY
Nov 19, 2024
/s/ Marilih Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

AO 93C  (08/18)  Warrant by Telephone or Other Reliable Electronic Means

☐ Original          ☐ Duplicate

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No.  24-M-537 (SCD) |
| 2266 N. Prospect Avenue, Suite 400, Milwaukee, Wisconsin 53202 | ) ) ) | |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____Eastern_____ District of _____Wisconsin_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before _____12-3-24_____ *(not to exceed 14 days)*

☑ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to _____Hon. Stephen C. Dries_____.
*(United States Magistrate Judge)*

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C.
§ 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:  ___11-19-24. 1:50 pm___          *Stephen C. Dries*
                                                                              *Judge's signature*

City and state:  Milwaukee, WI          Honorable Stephen C. Dries, U.S. Magistrate Judge
                                                      *Printed name and title*

| **Return** | | |
|---|---|---|
| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

**Certification**

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

# ATTACHMENT A-1

## *PROPERTY/PREMISES TO BE SEARCHED*

The premises located at 2266 N Prospect Avenue, Suite 400, Milwaukee, Wisconsin 53202 (**Subject Premises**). **Subject Premises** is a single unit within a multi-story business located on the southeast corner of N Prospect Avenue. The numbers "2266" are affixed in a horizontal fashion in bold white numbers across the top of the main entrance facing N Prospect Avenue. The exterior of the building is described as having a tan stone and brick finish with three windows on each floor facing north side of the business. The south side of the building has a parking structure attached to the building. The main entrance to the business is facing N Prospect Avenue and has a glass front with two glass doors. The numbers "2266" are affixed in a horizontal fashion in bold white numbers above the main entrance. Suite number 400 is located on the fourth floor of 2266 N Prospect Avenue, on the east side of the building, the suite faces Prospect Avenue. The entrance to Suite 400 is a wooden door with a black frame, there is a white placard affixed next to the door with the numbers "400" and an additional placard affixed to the wooden door which reads Northbay Freight. The business is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin; **SUBJECT PREMISES** includes all, storage facilities, outbuildings and garages within the curtilage of the **SUBJECT PREMISES**. Areas in **SUBJECT PREMISES** to be searched include all rooms, areas behind false walls, containers, and safes.



1

**ATTACHMENT B**

***ITEMS TO BE SEIZED***

1.      All records, documents, evidence, and information on the premises or on any cellphones, computers, electronic devices, and storage devices containing evidence of or used as a means to commit violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of cocaine), 18 U.S.C. § 1956 and 1957 (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 31 U.S.C. § 5331 (failure to file Form 8300, Reports of Cash Payments Over $10,000 Received in a Trade or Business) (the "Subject Offenses"), namely:

   a.   Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances;

   b.   Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

   c.   Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

   d.   Books, records, correspondence, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential co-

2

conspirators, formulas, receipts, phone records, phone books, address books, notations and other papers, and any files relating to the transmission and exchange of cryptocurrency and/or other monetary instruments;

e. Indicia of occupancy, residency, and/or ownership of the previously described property, premises, or vehicles, including utility and telephone bills, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, envelopes, registration, receipts, and keys which tend to show the identities of the occupants, residents, and/or owners;

f. Records concerning the use of commercial mail receiving agencies and/or post office boxes;

g. Financial records, including bank statements, bank receipts, passbooks, bank checks, money market or similar accounts, money drafts, letters of credit, payroll documents, employer information, income and expense records, Federal and State income tax returns, money orders, cashier's checks, loan applications, credit card records, safe deposit box and records, acquisitions, notes, and records reflecting vehicles, aircraft or vessels owned, purchased, sold or leased;

h. United States currency, and records relating to income derived from money laundering and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, cash cards, gift cards, checkbooks, check registers, securities, precious metals, jewelry, antique or modem automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of money laundering;

i. Proceeds of drug trafficking activities, such as currency, crypto currency, precious metals, financial instruments, jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of drug trafficking activities;

3

j. Storage units and containers, such as floor safes, wall safes, upright safes (also known as gun safes), lock boxes, and other self-contained locked enclosures;

k. Documents indicating travel in interstate and foreign commerce to meet with clients and/or co-conspirators, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

l. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g. records of or information about Internet Protocol addresses used by the device.

3. As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications,

4

and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

4.      As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

During the execution of the search of the person described in Attachment A, law enforcement personnel are authorized to obtain from Antonio Long, Shalyn Long, and/or Stephen Humphries, the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock the a digital device, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, for the purpose of attempting to unlock the Device's security features in order to search the contents as authorized by this warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically

5

stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, case agents may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6

CLERK'S OFFICE
A TRUE COPY
Nov 19, 2024
/s/ Mariah Kauder
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

In the Matter of the Search of
*(Briefly describe the property to be searched or identify the person by name and address)*

2266 N. Prospect Avenue, Suite 400,
Milwaukee, Wisconsin 53202

Case No. 24-M-537 (SCD)

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Wisconsin _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 21 U.S.C. §§ 841(a)(1); 846; & 843(b); 18 U.S.C. §§ 1956; 1957; 31 U.S.C. § 5331 | Possession with the intent to distribute; conspiracy to possess with the intent to distribute controlled substances; illegal use of a communication facility; money laundering; Failure to file Form 8300 |

The application is based on these facts:

See Attached Affidavit.

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Curt R Hansen*
*Applicant's signature*

Curt Hansen, HSI SA
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means)*.

Date: 11-19-24

*Stephen C. Dri*
*Judge's signature*

City and state: Milwaukee, WI

Honorable Stephen C. Dries, U.S. Magistrate Judge
*Printed name and title*

<u>**AFFIDAVIT IN SUPPORT OF**</u>
<u>**AN APPLICATION FOR A SEARCH WARRANT**</u>

I, HSI Special Agent Curt Hansen, being duly sworn, declare and state as follows:

## I.     <u>INTRODUCTION</u>

1.      I am a Special Agent ("SA") with the United States Department of Homeland Security, Homeland Security Investigations (HSI), assigned to the Resident Agent in Charge (RAC) Milwaukee, Wisconsin.  I have been employed with HSI as a Special Agent for approximately three years.  Prior to employment with HSI, I worked as a Deputy United States Marshal, Federal Air Marshal, and United States Border Patrol Agent. I have been a sworn federal law enforcement officer specifically investigating crimes involving narcotics, firearms, smuggling, terrorism, and immigration since September 2011. Throughout my law enforcement career, I have received training in general law enforcement and in specialized areas including narcotics and human smuggling. I am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), in that I am empowered by law to conduct investigations of and to make arrests for federal felony offenses.   Since becoming employed as a federal agent, I have completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Brunswick, Georgia.  As part of my duties and responsibilities as an HSI Special Agent, I am authorized to investigate crimes that involve narcotics violations pursuant to Title 21, United States Code.

2.       As part of my duties as an HSI Special Agent, I have experience conducting criminal investigations involving narcotics, firearms, gangs, and human smuggling and have participated in the execution of search warrants in such investigations. I am familiar with various methods of smuggling and trafficking narcotics and other controlled substances and the proceeds from sale of such substances.  I am also familiar with methods used to evade detection of both the controlled substances and the proceeds from their sale that are used by drug traffickers. Through my training and experience, I am familiar with the way in which narcotic traffickers conduct their business, including, but not limited to: the types and amounts of drugs distributed; the types and

amounts of profits made; the methods of importing and distributing controlled substances; the use of mobile telephones, email accounts, and the Internet to facilitate their transactions; and the use of numerical codes and code words to conduct their dealings.

3.      I have participated in investigations that have led to the issuance of search warrants involving violations of narcotic laws.  These warrants involved the search of locations including: residences of targets, their associates and relatives; "stash houses" (i.e., houses used as drug/money storage locations); storage facilities; cellular/camera phones; and computers.  Evidence searched for and recovered in these locations has included controlled substances, records pertaining to the expenditures and profits realized from the distribution and sale of controlled substances, and monetary instruments and various assets that were purchased with the proceeds of the drug trafficking.  I have participated in the execution of multiple federal search warrants.

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.   Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated. Throughout this affidavit, reference will be made to case agents or investigators. Case agents or investigators are those federal, state, and local law enforcement officers who have directly participated in this investigation, and with whom your Affiant has had regular contact regarding this investigation.  The investigators included a licensed Certified Public Accountant who retired after 28 years as a criminal investigator with the Internal Revenue Service and has contracted since 2011 as a Senior Financial Investigator with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives.

## II.  <u>PURPOSE OF AFFIDAVIT</u>

5.      This Affidavit is made in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant for the following premises, which is further

described in Attachment A, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of cocaine), 18 U.S.C. § 1956 and 1957 (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 31 U.S.C. § 5331 (failure to file Form 8300, Reports of Cash Payments Over $10,000 Received in a Trade or Business) (the "**Subject Offenses**"):

      a.     The premises located at 2266 N. Prospect Avenue, Suite 400, Milwaukee, Wisconsin 53202 (hereinafter "**Subject Premises**"), believed to be the business operated by Antonio Long, Shalyn Long, and Steven Humphries, as described more fully in Attachment A;

6.     The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offenses being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## II.     <u>SUMMARY OF PROBABLE CAUSE</u>

7.     Federal law enforcement agencies -- including HSI, the Internal Revenue Service-Criminal Investigation, the Drug Enforcement Administration, the Bureau of Alcohol, Tobacco, Firearms, and Explosives, -- are investigating the Marin drug trafficking organization's ("DTO") distribution of illegal drugs, including large quantities of cocaine, across the United States and the DTO's money laundering operation. As discussed below, Marin is believed to be the leader of this drug trafficking conspiracy and money laundering operation. Marin has been utilizing commercial shipping entities including the Federal Express ("FedEx") to distribute drugs across the United States and to receive drug proceeds. Marin conspired with Long to supply Milwaukee, Wisconsin distributors, the subject referred to herein as Confidential Source #1 ("CS#1"), and

Perry, with as much as 30 kilograms of cocaine, per month from at least 2017 through 2022. Participants in the Marin DTO and money laundering operation include Marin, Marin's wife, Julieana Munoz, Graciela Gonzalez Cruz, Antonio Long, Brian Wilbert, Michael Aleman, Rafael Lomeli, Rafael Ponce, Gerardo Arriaga-Diaz, Bobby Perry, and others known and unknown to distribute large quantities of illegal drugs. Marin utilized his jewelry business, "JM Time Corp / R&J Watch Co" to facilitate and disguise his cocaine trafficking activities and the proceeds derived therefrom in various ways, including the following:

a. Long, a resident of Gilbert, Arizona, brokered shipments of large quantities of cocaine from Marin to CS#1 and Perry by inquiring from these distributors how much cocaine he should order, then placing the orders with Marin. These communications occurred via electronic communication devices;

b. Marin delivered the cocaine from JM Time Corp / R&J Watch Co's physical location at 631 S. Olive Street, Los Angeles, California 90014 to Brian Wilbert, Antonio Long's cousin, who drove the cocaine from California to Milwaukee, Wisconsin. Cocaine was seized by HSI during an interdiction operation targeting Wilbert. Wilbert later admitted to picking up the cocaine from 631 S. Olive Street and driving it to Wisconsin. Global positioning data obtained by a GPS device placed on Wilbert's vehicle corroborates that Wilbert picked up the cocaine from 631 S. Olive Street;

c. Based upon Marin's iCloud records, and Long's admissions that he had a substantial drug debt that he owed to Marin and would make periodic payments based upon his available funds, it appears that Long continued to pay Marin related to their prior drug transactions even after the execution of a federal search warrant at Long's residence in 2023. Based upon the records, Long made what appears to be a payment to Marin towards the drug debt as recently as July 2024.

d. The Milwaukee, Wisconsin distributors of Marin's cocaine shipped the currency derived from their sales of the cocaine to Marin via his business, "R&J"; i.e., JM Time Corp / R&J

4

Watch Co. The shipments were made through commercial parcel shipping company Federal Express. Marin disguised the large amounts of cash drug proceeds being shipped to him as proceeds from his business's (JM Time Corp / R&J Watch Co) sale of jewelry. Marin provided fictitious invoices to his drug distributors for inclusion with the cash being shipped from the drug distributors to Marin. The invoices were prepared through an internet (computer/cell phones) application hosted by Wave Financial USA, Incorporated;

e. Marin provided his cocaine distributors with FedEx labels for use in shipping their drug proceeds to Marin. Marin generated the labels at a neighboring business, IFS Inforsure, Incorporated. Those FedEx labels listed both the sender and the receiver of the currency-ladened packages as Marin through his business, abbreviated as "R&J". Thus, the labels disguised the packages as being related to the jewelry business and the labels concealed the true identities of the persons sending the packages, as well as the locations from which the packages actually originated;

f. Marin and other individuals deposited some of the drug proceeds into his JM Time Corp bank accounts, thereby disguising the drug proceeds as jewelry proceeds. Marin also established other alleged business entities (and bank accounts in their names) through which the drug proceeds, after being commingled in the JM Time Corp bank accounts, were transferred to further disguise the source of the funds. Said accounts were used to conduct personal transactions, including some with Marin's co-conspirators;

g. Marin, in the name of JM Time Corp / R&J Watch Co, often received currency payments greater than $10,000, including the parcels shipped from CS#1 which often contained more than $200,000 in drug proceeds. Marin was required to file a currency transaction report with the United States Department of Treasury's Financial Crimes Enforcement Network (FinCEN), which Marin failed to do;

h. Marin eventually conspired with other individuals, including Michael Aleman and Graciela Gonzalez-Cruz, to establish fictitious business entities for which they too could produce fictitious invoices and FedEx labels, and through which Marin's cocaine distributors would

ship their drug proceeds to Marin. This too required the filing of Form 8300 (currency transaction reports), which were not filed;

i. Gonzalez-Cruz would use her apartment at 12550 Crenshaw Boulevard Unit #410, Hawthorne, California 90250 to receive large quantities of FedEx parcels containing US currency using false invoices under the name of Virgo Stones and Jewelry Co. CS #1 sent currency ladened FedEx parcels to Gonzalez-Cruz and provided the false invoices to case agents. Historical FedEx subpoenas compared to recent ones show the same pattern of parcel traffic to Gonzalez-Cruz indicating she is still receiving parcels of currency, as Virgo Stones Jewelry Co. was created for the sole purpose of making currency parcels look like legitimate business parcels. According to Antonio Long, after Gonzalez-Cruz receives the parcels, she gives them to Marin as he handles all of the narcotics proceeds; and

j. Antonio Long uses his business account, Northbay Freight, to make payments directly to John Marin for proceeds of narcotics as well as debts for narcotics. The Northbay Freight business account has been linked to payments directly to Marin. Shalyn Long is the office manager of Northbay Freight. Shalyn Long makes payments to John Marin on behalf of Northbay Freight's business account. Payments from the Northbay Freight account have been made as recent as July 2024. Earlier payments to Marin were confirmed as payments for narcotics by case agents during an interview of Antonio Long in January 2023. The **Subject Premises** is the physical business location for Northbay Freight.

8. As set forth herein, law enforcement believes evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found at the **Subject Premises**.

### III. STATEMENT OF PROBABLE CAUSE

9. As documented below, Marin, Long, and others engaged in large-scale cocaine trafficking and used falsified invoices and deceptive FedEx labels to disguise bulk drug proceeds shipments as legitimate proceeds from jewelry sales.

### A. Wisconsin Search Warrant

10.     In August 2022, HSI Milwaukee, Milwaukee Police Department Violent Crimes Unit (MPDVCU), along with members of DEA Group 68 initiated an investigation into individuals distributing cocaine throughout Milwaukee, Wisconsin.  HSI identified the individuals involved in this cocaine drug trafficking as, among others, Antonio Long, Brian Wilbert, John Marin, Graciela Gonzalez Cruz, Michael Aleman, and Bobby Perry.

11.     On August 9, 2022, MPDVCU executed a Wisconsin State search warrant at 5709 North 78th Street, Milwaukee, Wisconsin.  During the search of the residence, MPDVCU located and seized crack cocaine, marijuana, psilocybin, two handguns (Glock 19 and Sig P365), various ammunition with high-capacity magazines, high dollar jewelry items, approximately $10,076 in US currency, various scales with narcotic residue, and other narcotics-related paraphernalia.  A black Samsung smartphone was also seized.  MPDVCU seized bank documents and invoices that displayed large currency transactions for jewelry, automobiles, and transfers of currency.  Among documents seized, an invoice with the business name "Buck Eyes" was seized.  Based on their training and experience, and the investigation to date, case agents believe the invoice is narcotics related, as explained further below. Finally, seized documents indicated that the target for the search warrant (CS#1) had a storage unit at W135N8945 Wisconsin 145, Menomonee Falls, Wisconsin in Waukesha County, Wisconsin.

12.     That same day, MPDVCU applied for and obtained an additional search warrant for storage unit number 515 at W135N8945 Wisconsin 145, Menomonee Falls, Wisconsin.  During the search of the storage unit, MPDVCU located 21 clear plastic baggies containing cocaine and five pressed bricks of a cocaine.  A combined total of 5.8 kilograms of cocaine was present. MPDVCU also recovered 20 large vacuum sealable plastic bags containing marijuana with a total

weight of 18.7 pounds. A .9mm Palmetto State Armory AR-15 (AR Pistol) and a Maverick model 88 12-gauge shotgun with sawed off barrel were located within the storage unit. Finally, MPDVCU seized approximately $39,610 in US currency from the unit.

13. On August 18, 2022, the MPDVCU requested assistance from HSI Milwaukee and DEA Group 68 to assist with the investigation. Through information obtained from a confidential source (CS #1), historical law enforcement records, electronic surveillance, toll record analysis, social media exploitation, and open-source databases, HSI Special Agents and MPDVCU determined the source of supply for the cocaine that was seized is John Marin, as brokered through Antonio Long. In sum, Long orders large quantities of cocaine from Marin. Long sends his driver, Brian Wilbert, to physically acquire the cocaine from Marin's jewelry store business and to transport the cocaine from Los Angeles, California to Milwaukee, Wisconsin. Marin informs Long of the amount owed to him for the cocaine and, via emails, provides Long with a FedEx label for use in shipping currency payments to Marin. Marin also provides Long with a fictitious invoice from his jewelry business, JM Time Corp / R&J Watch Co. The purpose of the invoice, which is intended to accompany the currency being shipped to Marin via FedEx, is to disguise the drug proceeds as jewelry-related proceeds. Investigators have determined that the Long / Marin drug trafficking organization (DTO) distributed as many as 30 kilograms of cocaine monthly to the Milwaukee, Wisconsin area, which at current Milwaukee area prices of between $21,000 to $24,000 per kilogram would generate approximately $630,000 to $720,000 of cocaine proceeds per month.

**B. Historical Information About Long's Drug-Trafficking From CS#1**

14. Case agents identified a confidential source, CS #1, who participated in distributing cocaine provided by the DTO in the Eastern District of Wisconsin. For several reasons, case agents

believe that CS #1 is reliable and credible. First, CS #1 has been providing information since August of 2022 and is still an active informant. Second, the information provided by CS #1 is consistent with evidence obtained elsewhere in this investigation where CS #1 was not utilized, and substantial portions of CS #1's information have been corroborated through independent investigation. CS #1 originally began cooperating with law enforcement in hopes of receiving consideration for state drug trafficking charges. As a result of CS #1's cooperation, CS #1 was not convicted of these charges. They have been dismissed and will not be reissued. CS #1 is no longer working for potential criminal case credit. Currently, CS #1 is continuing to cooperate with law enforcement as a paid informant. CS #1 has prior felony convictions for robbery and a weapons violation. Finally, CS #1 has had an adequate opportunity to directly observe the events discussed and/or has heard conversations directly from the individuals discussed herein. For these reasons, case agents believe CS #1 to be reliable.

15. In 2022, CS #1 was interviewed by case agents regarding CS #1's participation in distributing cocaine provided by the DTO in the Eastern District of Wisconsin. CS #1 told case agents that the cocaine is transported via a white Ford Transit van concealed in furniture or within a trap built into the vehicle's floor. CS #1 also stated that the driver of the white van is Brian Wilbert. Law enforcement database checks revealed a white Ford Transit van bearing Arizona license plate number Z6A6CAA was registered to Brian Wilbert. CS #1 stated that Wilbert was the primary source of transportation for the Long DTO. Wilbert is the cousin of Long and, like Long, has a residence in Gilbert, Arizona. CS #1 stated that upon receipt of the cocaine, the Long DTO sells the cocaine by the kilogram, frequently making multiple kilogram sales per customer. CS #1 stated that the Long DTO has been actively operating in the Milwaukee area for approximately five years (this statement was made in 2022, so the five-year timeframe CS #1

9

referenced is approximately 2017 to 2022). Your affiant notes that the $630,000 - $720,000 of cocaine proceeds generated every month is between $7,560,000 - $8,640,000 per year; and between $37,200,000 - $43,200,000 over five years.

16.     CS #1 stated that she/he regularly communicated with Wilbert through cellular telephones to coordinate delivery of narcotics over the past five years (approximately 2017 to 2022). Wilbert would contact CS #1 to coordinate the "drop" of cocaine and marijuana.[1] Shipments of cocaine and marijuana were delivered to locations in Milwaukee, Wisconsin monthly and, on several occasions, biweekly, for over five years. Throughout the duration of the shipment, CS #1, Wilbert, and Long would maintain contact to ensure delivery of the narcotics.

17.     On September 7, 2022, HSI and DEA Group 68 conducted a forensic analysis of the cellular telephone that was seized from the search warrant conducted at 5709 North 78th Street, Milwaukee, Wisconsin. A review of the SMS text messages revealed conversations between CS #1 and Long. The text thread covered a period of four months and detailed conversations between CS #1 and Long discussing the transportation and sale of narcotics. Long frequently sent text messages highlighting when shipments of cocaine and marijuana, transported by Wilbert, were to be sent to CS #1. Long would also notify CS #1 when packages of the drug proceeds were to be sent back to Los Angeles, California. The text messages indicate that Long procured and directed the shipments of cocaine.

18.     CS #1 stated the currency-based proceeds from his/her cocaine sales were collected by CS #1 and shipped to John Marin via FedEx, from FedEx locations in the greater Milwaukee area. Long had instructed CS #1 on how to arrange the currency and an invoice for jewelry in a

---

[1]   According to CS #1, Long also conspired with Carlos Ferreira, a Los Angeles area associate of John Marin, to acquire marijuana from Ferreira's DTO and transport it to Milwaukee for distribution by CS#1 and Perry.

FedEx package. Long then periodically emailed FedEx shipping labels and fictitious invoices to CS#1. CS #1 showed case agents several of the emails sent from Long. Long's email address was illdreams88@gmail.com. Listed on the invoices were high-dollar jewelry items, for example Rolex watches. CS #1 stated that "jewelry" and jewelry-related terms are used as code words for the cocaine on the invoices to give the impression of a legitimate business transaction. CS #1 has acknowledged having mailed upwards of $275,000 at one time.

19.     CS #1 received an invoice from Long approximately every week from Long's email address. The invoices primarily purported to be from JM Time Corp / R&J Watch Co, 631 S. Olive Street, #202, Los Angeles, California 90014. However, other invoices purported to be from other businesses, including Virgo Stones and Jewelry and International Players Club Inc. (also known as IPC Jewelry), among others. Open records checks on the above-listed businesses indicate that JM Time Corp is a registered limited liability corporation with the State of California associated with Marin. Virgo Stones Jewelry does not have an official registration with the State of California or any other official entity, however, FedEx shipping labels reveal it is associated with Graciela Gonzalez-Cruz. International Players Club / IPC Jewelry Company may be the same company that applied for an official registration with the State of California more than 20 years ago, in the name of a different individual. However, it is now associated with Michael Aleman, an associate of both John Marin and Carlos Ferreira, through bank records.

**C.  Arrest of Brian Wilbert and Recovery of Narcotics**

20.     On October 19, 2022, law enforcement obtained a search warrant to track the location of Wilbert's 2019 White Ford Transit Van, bearing Arizona license plate number Z6A6CAA   On November 21, 2022, at approximately 9:00 AM, the Waukesha County Drug Group stopped Wilbert's white Ford van on Interstate 43 near the city of Mukwonago, Wisconsin.

11

Wilbert was the driver and sole occupant. This area is in the southeastern corner of Waukesha County, Wisconsin within the Eastern District of Wisconsin. A K9 alerted to the presence of narcotics in the vehicle and the vehicle was later searched. The search yielded 3.7 kilograms of cocaine/fentanyl mix, 23.22 kilograms of marijuana, and 889 grams of psilocybin. All items were seized, and Wilbert was taken into custody.

21. On November 21, 2022, after being advised of and waiving his rights, Wilbert made a statement during which he admitted that he drove to Los Angeles on November 18, 2022, where he contacted a man named "Red," who owns jewelry stores in the area. Wilbert identified John Marin by photograph and as the same individual he knows as "Red." Wilbert stated that he picked up cocaine at a jewelry store at 631 S. Olive Street, Suite 202. Wilbert stated that the jewelry store at 631 S. Olive Street, Suite 202, is owned by Marin and is called JM Time Corp. Wilbert stated that he transports cocaine for Marin and has been doing so for the past three years. Wilbert stated he contacts Marin by using WhatsApp and showed case agents a text thread in WhatsApp between Wilbert and Marin. Case agents viewed the text thread in which Marin gave Wilbert instructions on when and how to pick-up cocaine at JM Time Corp. Wilbert stated when he stopped in front of JM Time Corp., Marin's assistant walked out of the jewelry store carrying a medium-sized black tote with a yellow lid. Wilbert said the assistant put the tote in Wilbert's van and walked back to the jewelry store. Wilbert said every time he has picked up narcotics from Marin, the assistant always brought out the narcotics and the narcotics were always in the exact same type of tote. Notably, the cocaine/fentanyl located in Wilbert's van on November 21, 2022, was stored inside a medium-sized black tote with a yellow lid. Based upon Wilbert's description of the assistant and on surveillance (electronic and physical) of the primary streetside entrance of 631 S. Olive Street in Los Angeles, California, your affiant believes the assistant is Rafael Ponce. Ponce was listed

12

as an alleged employee of JM Time Corp when Marin applied for a COVID loan in 2020, according to records received from Funding Circle, as described below. During a recorded interview of Antonio Long, Long was provided a picture of Ponce and he positively identified Rafael Ponce as being John Marin's assistant.

22.     Wilbert stated after he received the cocaine from Marin during the November 2022 trip, Wilbert drove south to Gardena, California. Wilbert said he stopped at a warehouse at the address of 1223 W. El Segundo Blvd, Gardena, California. He stated the address was where an unknown man named "C", whom your affiant now believes to be Carlos Ferreira, told him to go to pick up a load of marijuana. Wilbert stated he was there for about an hour while a group of men canned and loaded marijuana in his van. The marijuana located in Wilbert's van on November 21, 2022, was stored in large aluminum cans that were sealed. Wilbert stated that after the marijuana was loaded into his van, he left the area and began driving toward Wisconsin.

23.     Wilbert claimed he was going to drive to Milwaukee, Wisconsin to meet "BJ" to deliver the narcotics load. Wilbert was shown a photograph of Bobby Perry, a subject identified though this investigation as being one of the Milwaukee area distributors for this DTO. Wilbert identified the photograph of Bobby Perry as "BJ." Wilbert stated that he was going to deliver the narcotics to Perry's residence located at 3710 W. Good Hope Road, Milwaukee, Wisconsin. Wisconsin utility records listed Perry as the owner of 3710 W. Good Hope Road. Wilbert stated that for years, he has delivered narcotics to Perry and to Perry's residence. Wilbert said that Perry, Long, CS #1, and Wilbert would coordinate cocaine shipments multiple times per month and have done so for over three years. Wilbert stated that Long is the broker for all of the narcotics shipments for the past four to five years. Wilbert stated Long is in contact with Marin and "C." Wilbert stated Long will contact Marin and "C" to negotiate narcotics shipments to Milwaukee,

Wisconsin. After Long has contacted Marin and "C," Long will contact Wilbert to determine which shipments Wilbert will transport. Wilbert stated that he generally gets paid $4,000 to transport the shipments and is paid in California before he begins the trip. Wilbert stated that, in the past, he has transported narcotics provided by Marin to other locations across the United States at Long's direction. Wilbert also gave the phone numbers for Marin (WhatsApp) 949-566-3812 and Long 323-523-3432. The phone numbers provided have been identified as Marin and Long's phone numbers based on investigative findings and tolls analysis conducted by case agents.

### D. Search of Long's Arizona Residence

24. On January 26, 2023, HSI Milwaukee and HSI Casa Grande executed a federal search warrant at 2888 S. Beckett Street, Gilbert, Arizona, which is associated with Antonio Long. HSI seized seven cellular telephones and two iPads from the residence and conducted a forensic examination of the devices. Case agents reviewed each forensic examination conducted to preserve any evidence. Notably, within the black iPad and two LG phones, case agents discovered preprinted shipping labels and invoices saved within the devices in the form of images and documents. These images were created and delivered via email and saved to Long's devices before being emailed, using bucksmke36@gmail.com and illdreams88@gmail.com, to the distributors in the Milwaukee area.

25. The preprinted FedEx shipping labels are the same type of labels encountered previously in the investigation. Both the shipper and receiver listed on most of the labels are Marin and/or R&J, with fewer FedEx labels listing both the shipper and receiver as Graciela Gonzalez Cruz / Virgo Stones, Michael Aleman / International Players Club (IPC Jewelry) and others. The sending and receiving addresses are both located in the Los Angeles, California area.

14

26.     The invoices located on the devices included some from JM Time Corp / R&J

Watch Co, Virgo Stones and IPC Jewelry, along with a purported business called "Buck Eyes",

which listed its telephone number as (323) 497-4868 and its email address as

bucksmke36@gmail.com, which is one of the email addresses used to send the JM Time Corp /

R&J Watch Co invoices and FedEx labels to CS#1.

27.     Following the search of Long's residence in Arizona, Long was advised of and

waived his rights.  Long then made a statement against his penal interest.  Long spoke to case

agents about his cocaine and marijuana distribution activities.  Long confirmed that he would order

shipments of narcotics from Marin and have Wilbert transport the narcotics to locations in the

greater Milwaukee, Wisconsin area.  During the interview, Long stated that the proceeds of the

narcotics sales were packaged in FedEx Express packages and shipped to Marin and others in Los

Angeles, California.  Long also acknowledged that he would receive preprinted shipping labels

and invoices from Marin and others and email them using illdreams88@gmail.com and

bucksmke36@gmail.com to narcotics distributors in Wisconsin.  Long was asked why the

proceeds did not go to him directly, and Long stated, "everyone sent all the money to John (Marin)

because he (Marin) has a system; the coke and the weed money went to him (Marin)."  Long also

stated, "John (Marin) has a system."

28.     CS #1 was subsequently questioned by case agents about the invoices and shipping

labels found on Long's electronic devices.  CS #1 explained that the invoices for "Buck Eyes" are

from Long.  CS #1 explained to agents that s/he would receive those invoices from Long for

marijuana orders/purchases.  S/he stated that "Buck Eyes" is Long's marijuana venture.  CS #1

said that s/he received invoices since the beginning when s/he was selling narcotics for the DTO.

CS #1 explained that at the start of the DTO, Long was selling marijuana.  S/he said that Long

contacted suppliers in California and the suppliers would front the marijuana to Long. Long took orders from dealers in various locations within the US and coordinated the shipment of the marijuana to the dealers, via mail or vehicle. CS #1 stated that first s/he received marijuana in the mail, but after the DTO got more business and orders became larger, Long employed Brian Wilbert to transport the narcotics. CS #1 also stated that Long used "Buck Eyes" invoices in order to differentiate between marijuana and cocaine proceeds.

29.　　CS #1 explained that after she/he received the narcotics, Long emailed an invoice from both illdreams88@gmail.com and bucksmke36@gmail.com with a shipping label. CS #1 said the invoices would indicate how much money was to be sent via FedEx back to California. CS #1 stated that all the proceeds were mailed via FedEx and the proceeds were always sent to locations in the greater Los Angeles, California area. CS #1 stated that the recipient was typically John Marin but that other recipients were sometimes used, including Michael Aleman, Graciela Gonzalez-Cruz, Michelle Sabra, Fernando Talley, and others. CS #1 stated that s/he mailed several hundred thousand dollars per month in proceeds based on the invoices.

30.　　CS #1 stated that when bulk cash was shipped via FedEx, the money was packaged in three layers. The first layer had the bulk cash in a smaller box/envelope, the second layer contained the packaged cash box/envelope placed into a medium box with an invoice, the third layer contained all previous contents placed in a larger box that was sealed. The exterior of the third box would have the preprinted shipping label affixed to it and would be shipped FedEx Express.

31.　　Records obtained from Apple reveal that John Marin is the listed subscriber for its iCloud accounts identified as randj15@icloud.com and jmtimecorp@icloud.com. During an interview with law enforcement, Long admitted to trafficking cocaine with Marin and to using

16

encryption apps and messages on his cellular telephone to facilitate and monitor narcotics trafficking. Long further admitted that he regularly sent Marin electronic payments for narcotics. Review of iMessages corroborates Long. For example, case agents located iMessages from Rafael Ponce (Marin's assistant) instructing Long to send payments to the randj15@icloud.com account. As another example, case agents located an iMessage in which Long instructed his daughter, Shalyn Long, to send payments to randj15@icloud.com. Case agents are aware that Apple permits payments to be sent to iCloud accounts via a service called Apple Pay. Based on their training and experience, and the investigation to date, case agents believe that the payments sent from Ponce and Shalyn Long to randj15@icloud.com were for narcotics provided by Marin.

### E. Search of Bobby Perry's Wisconsin Residence

32.     On January 26, 2023, HSI Milwaukee executed a federal search warrant at 3710 W. Good Hope Road in Milwaukee, Wisconsin which is associated with Bobby Perry. HSI seized several electronic devices including cellular telephones and computers. Forensic examination of the devices revealed shipping labels and invoices from JM Time Corp / R&J Watch Co and some of the other previously mentioned companies. Case agents also recovered multiple text threads discussing the purchase and sale of narcotics in Perry's phone. The dates listed on these invoices and text threads cover the time between October 2022 and January 2023.

33.     Review of all documents and electronic devices from the above described search warrants confirm that Long was conspiring with John Marin to procure and transport cocaine and marijuana from Los Angeles, California to distributors in the Milwaukee, Wisconsin area; and that Marin and Long conspired to disguise the shipments of the proceeds from the sale of those drugs as proceeds from the sales of jewelry by Marin's business, JM Time Corp / R&J Watch Co. Marin initiated the money laundering scheme by producing fictitious jewelry sale invoices through Wave

Financial USA, Inc.'s internet application, by producing disguised FedEx labels through IFS Inforsure, Inc, and by having those invoices and labels emailed to Long's email addresses. Long then forwarded the invoices and FedEx labels to the Milwaukee area distributors, who used them to send the drug proceeds to Marin. Further, the invoices were for amounts greater than $10,000 and CS #1 admits sending far more currency than the amounts of the invoices, which is evidence that Marin was obligated to file Forms 8300 with the United States' Department of Treasury. Long used the bucksmke36@gmail.com and illdreams88@gmail.com emails to facilitate the drug trafficking activity and the shipment of their proceeds.

### F. Surveillance of Subject Premises

34.     A photograph of the directory of business offices at 2266 N Prospect Avenue, taken on November 5, 2024, revealed the occupant of suite 400 (**Subject Premises**) as "Northbay Freight."

35.     Case agents conducted surveillance of suite 400. Agents observed a placard with "400" and a brown wood door that had a sign reading "Northbay Freight" on the center of it.

### G. Ronnell Panopio Identified as Marin's Business Partner

36.     Your affiant believes Ronnel[2] Panopio is John Marin's business partner in JM Time Corp / R&J Watch Co, based on the following posts made to Panopio's Instagram page "slpapi," which reveal their business and personal relationship:

---

[2]     In various records and databases, Panopio's first name is spelled "Ronnel" and "Ronnell."

- 05/11/2015 Video:



37. The video begins at the entrance to R&J Watch Co and moves into a room where someone is counting cash. The text indicates their willingness to accept currency that is likely the proceeds of illegal income; i.e., "we take care of everyone! we don't discriminate! 5s, 10s, 20s when the hood scoops a nice little watch up"

- 11/22/2016 – Video:



38.     This video shows several rooms within R&J Watch Co's office space. The text reveals, "just a tiny portion of our office … R&J Watch Co." It also links to John Marin's Instagram page.

- 03/05/2016 – Photo:



39.     This post, which was made during the time-period Panopio was under surveillance by Los Angeles area law enforcement officers and just two months prior to his arrest on May 6, 2020, as described below, reveals their close personal and business relationship:

> "Happy Birthday to this pain in my ass that's going to be in my life forever. Always grateful for your friendship and our businesses."

40.     This post confirms that the R&J in R&J Watch Co … "stands for Ronn and John". Further, it reveals that both Panopio and Marin are still involved in the business as of May 2023.

- 05/16/2023 – Photo:



Panopio's Instagram posts also reveal an extravagant lifestyle, despite no wages having been reported, to California's Employment Development Department, as paid to him since at least 2018.

41.     Reports obtained from the Los Angeles Police Department document that Ronnel Panopio was arrested on May 6, 2020, after law enforcement officers searched his personal residence and a residence he used as a drug stash house. The searches produced one kilogram of cocaine, 500 pounds of marijuana, guns, $206,000 in currency and electronic devices containing detailed drug ledgers and other evidence. The reports also reveal the arrest of Tremain Stephens on April 30, 2020 after he departed Panopio's stash house and was found in possession of approximately eight pounds of cannabis and approximately $57,000 in bulk cash, along with a concealed, loaded firearm. Records obtained from Zelle reveal that Stephens continued to make payments to Panopio, totaling $11,400, in the years following the arrests, 2021 through 2023. Also arrested at Panopio's stash house was William Parsons, who appeared to be providing security at the stash house. Zelle records also reveal payments from Parsons to Panopio. The Panopio case had not been presented for prosecution.

42. Financial institution records reveal that Panopio lists himself as an owner of R&J Watch Co and that he continued to receive large Zelle payments from JM Time Corp and John Marin as late as June 4, 2023. However, information received from California's administrator of the federal unemployment insurance program, the Labor and Workforce Development Agency, reveals that no wages were reported as being paid to Panopio from January 2018 through June 2023, as per below.

**H. Business and Tax Records:**

43. Business establishment records filed with the office of California's Secretary of State revealed the following information about business entities associated with John Marin and his associates:

a. JM TIME CORP, INC. was established by LegalZoom.com on April 28, 2014. Its address as of July 29, 2020 is 631 S. Olive Street, #202, Los Angeles, California. Its officer and secretary is John Marin.

b. EMJ WHOLESALE, LLC was established by John Marin on April 4, 2018. Its business address is 631 S. Olive Street, #202, Los Angeles, California.

c. SECTOR RECORDS, LLC was established by John Marin on November 12, 2021. Its business address is 631 S. Olive Street, #202, Los Angeles, California.

d. No record exists for a business entity named R&J WATCH CO.

e. No record exists for a business entity named VIRGO STONES & JEWELRY.

f. A business entity was established in the name of INTERNATIONAL PLAYERS CLUB, LLC by a Michael Scipio of North Hollywood, California on November 18, 2002. It was declared inactive as of December 2, 2013.

g. No record exists for a business entity named IPC JEWELRY COMPANY.

22

44. California's Labor and Workforce Development Agency provided wage and unemployment benefit records related to John Marin, his businesses, and his close associates. Those records reveal the following:

    a. No wages were reported as being paid to the following individuals from January 2018 through June 2023: John Marin, Julieana Munoz-Marin, and Ronnell Panopio.

    b. Marin's businesses, JM Time Corp / R&J Watch Co, EMJ Wholesale, and Sector Records, failed to report wages paid to any employees from January 2018 through June 2023.

45. However, records received from FC Marketplace, LLC, doing business as Funding Circle, revealed John Marin electronically submitted an application for a Paycheck Protection Program loan through Funding Circle to the United States' Small Business Administration on June 15, 2020, which was signed by Marin, under penalties of false statements, and dated June 15, 2020; and that Marin submitted an Employer's Quarterly Federal Tax Return covering the first quarter of 2020 (January through March), which claimed wages paid to four employees totaling $44,070; i.e., John Marin, $4,538.00; Fabian Diaz, $3,692.30; Raphael [sic] Ponce, $3,692.30; and Julieana Munoz (Marin's wife), $2,769.24.

46. Other documents submitted with the application included the following, which are evidence that Marin retains his financial records: John Marin's 2017 Individual Income Tax Return (Form 1040), including a Schedule C, "Net Profit From Business" form for JM Time Corp, which claimed zero wages paid to anyone other than John Marin; and JM Time Corp's 2018 Income Tax Return (Form 1120S), which claimed zero wages paid to anyone other than John Marin; and JM Time Corp's Chase Bank checking account (#591556852) statements for the months of December 2019 through May 2020.

47.     According to records obtained pursuant to an ex parte tax order, R&J Watch Co,

EMJ Wholesale, and Sector Records did not file income tax returns for the years 2018 through

mid-2023.   Further, no employment tax returns were filed for JM Time Corp, LLC or these

businesses during that period.

### 1.    Invoices – Wave Financial USA, Inc.

48.     The fictitious invoices provided to CS#1 and Bobby Perry for use in shipping their

drug proceeds to Marin were created through an Application (App) called "Wave: Small Business

Software" or through Wave Financial USA, Incorporated's website.   Wave Financial was

subpoenaed for evidence related to all invoices generated for JM Time Corp / R&J Watch Co.

Wave Financial's response appears to be incomplete in that they failed to provide copies of all but

a few invoices generated after July 2021.  Further, Wave Financial has failed to respond to requests

for the missing records.  However, the records provided by Wave Financial reveal that JM Time

Corp / R&J Watch Co. (hereafter also referred to as "R&J") opened its account with Wave

Financial USA, Inc. on February 19, 2015.  That was also the date of R&J's first login to Wave's

network and the date of the first three invoices generated by R&J.  The Company and Customer

Names on those invoices were, as follows: (1) Invoice #1: Icebox, Inc. --Zahir Jooma; (2) Invoice

#2: Austin's Watches -- Austin Peterson; and (3) Invoice #3: Watch & Wears -- Jaime Cruz.

49.     Invoice #2 reveals JM Time Corp / R&J Watch Co.'s address as 631 S. Olive Street

#202, Los Angeles, California 90014.  It also reveals the physical address for Austin's Watches.

This invoice also provides an extensive list of items sold or repair services provided, as well as

payment information.

50.     The last invoice that case agents have reviewed, dated April 19, 2024, continued to

list JM Time Corp / R&J Watch Co.'s address as 631 S. Olive Street #202, Los Angeles, California

90014. The invoice number is listed as 1058. That invoice number indicates invoice numbers were used out of sequence, when compared to the last invoices generated for Antonio Long via BucksMKE36@gmail.com and IllDreams88@gmail.com, which were invoice number 1090, dated June 28, 2021, and invoice number 1345, dated November 23, 2023, respectively.

51.     A comparison of the above invoices reveals differences between the seemingly legitimate invoices (i.e. Austin's Watches) to the suspected fictitious, cocaine-related, invoices to BucksMKE and IllDreams. The identity of the person(s) associated with the fictitious invoices is not revealed. Product or repair service information on the fictitious invoices is minimal. The dollar amounts on the fictitious invoices are rounded to the thousands, whereas the dollar amounts on the seemingly legitimate invoices are not.

52.     Wave Financial's "Invoice" spreadsheet for R&J reveals that during the period beginning February 19, 2015 through April 19, 2024, R&J logged into Wave's network 1490 times and generated 1488 invoices. The grand total amount of the invoices is approximately $21,000,000.

    a.  R&J's top 4 customers, by total invoice amounts were as follows:

        i.  BucksMKE    $2,796,595        13% of total invoices;

        ii.  IllDreams   $2,549,100        12% of total invoices;

        iii.  SanchezL4321  $912,000      4% of total invoices; and

        iv.  Icebox, Inc.  $858,6894% of total invoices.

    b.  R&J invoices were sent to the following suspected cocaine trafficking conspirators related to the Milwaukee, Wisconsin area drug trafficking organization (DTO):

        i.  BucksMKE                              $2,796,595

        ii.  IllDreams                             $2,549,100

        iii.  Antonio Long                          $34,500

25

    iv.  Antonio Long, as NBF(NorthBay Freight) $300,000

    v.  Carlos Ferreira                       $148,200

    vi.  Mike Aleman                    $   305,500

         **Total**                       **$ 6,133,895**

c. Thus, at least $6,000,000 of R&J's $21,000,000 of invoice totals (29%) are believed to be related to Long and Marin's Milwaukee, Wisconsin cocaine trafficking activities.

d. The number of invoices associated with the Milwaukee DTO and their time-periods, beginning with the earliest invoices, were as follows:

    i.  Antonio Long - 3              11/01/2017 – 08/23/2023

    ii.  IllDreams - 111              11/22/2017 - 11/06/2023

    iii.  Mike Aleman - 7             04/26/2018 – 11/25/2018

    iv.  Carlos Ferreira - 4           10/04/2018 – 12/08/2022

    v.  BucksMKE - 115            08/23/2019 – 06/28/2021

    vi.  NBF (NorthBay Freight - Long)- 1   03/09/2022.

53. The above time periods for IllDreams and Antonio Long reveal the continuation of financial transactions between Long and Marin, despite a federal search warrant having been executed at Long's residence on January 26, 2023.

54. The "Invoice" spreadsheet also revealed the following:

a. The first invoice to a known member of the Milwaukee cocaine DTO did identify the individual, Antonio Long. That invoice was dated November 1, 2017. The subsequent invoice, dated November 22, 2017, was addressed to Long's email address of IllDreams88@gmail.com. It did not identify Antonio Long or Long's physical address.

b. The number of invoices related to members of the Milwaukee cocaine DTO for the years 2017 through 2023 were as follows:

|      |     |
|------|-----|
| 2017 | 3   |
| 2018 | 53  |
| 2019 | 83  |
| 2020 | 56  |
| 2021 | 42  |
| 2022 | 3   |
| 2023 |     |

c. Invoices addressed to BucksMKE or IllDreams stopped after June 28, 2021, until three invoices were addressed to IllDreams in the fall of 2023.

d. Two invoices addressed to Antonio Long preceded the 2023 invoices to IllDreams. They were dated August 15, 2023 and August 28, 2023, and in the amounts of $15,000 and $7,000, respectively.

e. There was one invoice to NBF Trucking, which is believed to be Antonio Long's company called NorthBay Freight. That invoice was dated March 9, 2022, and in the amount of $300,000.

55. A comparison of the Wave Financial Invoice totals per year to the sales income reported on Marin's JM Time Corp business tax returns (obtained via ex parte tax records), reflected below, corroborates the falsity of many of the invoices.

| Year | Tax Return: Sales | Invoice Totals | Difference |
|------|-------------------|----------------|------------|
| 2018 | $2,150,471 | $ 4,093,042 | ($1,942,571) |
| 2019 | $1,743,950 | $ 4,413,936 | ($2,669,986) |
| 2020 | $2,209,162 | $ 3,862,100 | ($1,652,938) |
| 2021 | $1,497,458 | $ 3,066,950 | ($1,569,492) |
| 2022 | $1,364,222 | $ 1,498,720 | ($   134,498) |

27

| Totals | $8,965,263 | $16,934,748 | ($7,969,485) |
|---|---|---|---|

56.     Wave records show that most of the invoices were created via the "web" rather than via "mobile." Based on this, I believe that evidence of these invoices will be found on the computers associated with JM Time Corp / R&J Watch Co. including those at its office at 631 S. Olive Street #202, Los Angeles, California.  Further, it is customary for businesses to maintain the following records, related to those invoices:

   a.   Purchase Journals of assets acquired;

   b.   Inventory Logs of assets purchased, possessed and sold;

   c.   Sales Journals of assets sold;

   d.   Customer Ledgers containing contact information and sales or repair histories;

   e.   Accounts Receivable records of payments due from customers;

   f.   Cash Receipts Journals of payments received from customers; and

   g.   Periodic Financial Statement, including Income Statements, Balance Sheets, Cash Flows, Tax Returns, etc.

57.     Your affiant believes those financial records will provide further proof of transactions related to Marin's cocaine trafficking activities through JM Time Corp / R&J Watch Co.

**2.     Federal Express Records**

58.     Federal Express provided records related to John Marin on two occasions.  Based on those records, on the information found at the website for IFS Inforsure, Inc.(Inforsure), the fact that most of Marin's FedEx packages were sent to Inforsure's Pasadena, California office, the fact that Inforsure also has an office next to JM Time Corp / R&J Watch Co (R&J)'s office, and a $2,025 payment to Inforsure from JM Time Corp's account at US Bank on September 18, 2023,

your affiant believes John Marin and/or others at R&J obtained their FedEx labels through Inforsure.

59.    The website for IFS Inforsure, Inc. / IFS International, https://shipinforsure.com, as of March 13, 2023, listed its corporate address as 959 E. Walnut Street, Suite 240, Pasadena, California (Inforsure Pasadena Address) and its Los Angeles Office as 631 S. Olive Street, Suite 203, Los Angeles, California.  Note that the jewelry store is Suite 202.  Inforsure's "About Us" page stated the following:

> Founded in 2016, IFS Inforsure combines the high-touch service and expertise of an experienced team with powerful online tools that make it simple, fast, and convenient to protect the value of your items during shipment. With worldwide economically priced shipping insurance coverage for major carriers, we offer domestic and international shipping insurance solutions tailored for each client's individual needs.
>
> Trust IFS Inforsure to insure your jewelry, luxury goods, electronics, pharmaceutical, and other high-end and time-sensitive shipments while in transit. We will help you minimize losses while freeing your time to focus on running and growing your business.

60.    FedEx initially provided account information documents (Customer Summary and Customer Comment logs), transaction documents (Shipment Information Reports) and an Excel workbook, named "284294 Shipment database for information only" that contained entries summarizing every shipment associated with subject locations in the greater Los Angeles area, and the Inforsure Pasadena Address, for the one-year period beginning September 2021 and ending September 2022.  Entries in the Customer Comments log included the statement, "They do let different businesses use their account number to ship."

61.    The Excel workbook listed 15,595 domestic packages associated with JM Time Corp. and the Inforsure Pasadena Address.  The shipment dates began with September 27, 2021, and ended with September 15, 2022.

62.     A review of the information appearing on the 15,595 FedEx packages reveals only 202 were directly traceable to John Marin by his name, by use of both the Olive Street and Walnut Street addresses, or by his business name of R&J (RJ).  Most of the 15,595 FedEx packages were not related to Marin or his businesses.  The majority were packages sent to/from IFS Inforsure at either the Olive Street address or the Pasadena address.  Others were packages sent to/from other tenants at those addresses. Analysis of the information concerning the 202 packages revealed the following:

      a.   149 (74%) of the packages were labeled as sent from John Marin and R&J, to John Marin and Ortho Lab, at the Inforsure Pasadena Address.

      b.   Two of the packages were labeled as sent from John Marin and R&J, 631 S. Olive Street, Los Angeles, California to John Marin and R&J, also at 631 S. Olive Street, Los Angeles, California.

      c.   One of the packages was labeled as sent from John Marin and R&J, 631 S. Olive Street, Los Angeles, California to John Marin / IWJG at 3801 Las Vegas Blvd., Las Vegas, NV.

      d.   Thus, 152 (75%) of the FedEx shipments were from Marin to Marin.

63.     "Shipment Information Reports" (SIRs) provided by FedEx in its "Tracking Documents" folder included "Pickup Location" and "Destination Location" information in the form of four and five-letter codes.  The pickup and destination codes for the 152 Marin-to-Marin labeled packages reveals that 116 (76%) of the Marin-to-Marin packages were sent from the Milwaukee, Wisconsin area during the one-year period of September 2021 to September 2022.

64.     The remaining Marin-to-Marin packages were sent from New York (15), Florida (4), Nevada (4), Arizona (2), Pennsylvania (4), California (3), Massachusetts (1), Texas (2), and North Carolina (1).

65.     In sum, this demonstrates that FedEx parcels were physically shipped from various locations outside of California but with shipping labels designed to make the parcels appear to have been sent from a Marin business in California to a different Marin business in California.

66.     A second subpoena was served on Federal Express to extend the time-period for possible Marin-to-Marin packages.  In response, FedEx provided package data from August 1, 2022, through June 3, 2023.  The new FedEx data revealed 63 additional packages were directly traceable to John Marin by his name, by use of the Olive Street or Walnut Street addresses, or by his business name, R&J (RJ). These 63 new FedEx shipments were addressed as both being from shipper name John Marin in California to recipient company name John Marin or John Marin R&J in California.

67.     Specifically, 56 of the packages were labeled as sent from shipper name John Marin and shipper company R&J/RJ at 631 S Olive Street Suite 202 to recipient name Ortho Lab/John Marin R&J and recipient company name John Marin/John Marin R&J at the Inforsure Pasadena Address.  Additionally, seven of the packages were labeled as sent from John Marin and R&J to John Marin R&J, also at 631 S. Olive Street, Los Angeles, California.

68.     The information contained in FedEx's "Shipment Information Reports" (SIRs) reveals that between September of 2022 and June of 2023, the "Marin to Marin" packages entered the FedEx system in eleven different states, including two packages sent from Milwaukee, Wisconsin. Thus, there was a stark decline in the number of packages entering the FedEx system in Milwaukee, which is consistent with the fact that CS #1 was arrested in August of 2022.

69.     A comparison of the shipping label data for all packages labeled through Inforsure revealed a distinct difference in the data appearing on labels produced for other jewelry companies and those produced for the Marin-to-Marin packages.  Shipments from other jewelers typically

provided unique sender and/or business name information and listed the initial recipient's name as Ortho Labs with the secondary recipient's company name typically being that of the business ultimately receiving the package that could be confirmed using open-source databases.

70.     CS #1 also stated that narcotics proceeds were sent to co-conspirator Graciela Gonzalez Cruz. Analysis of the second FedEx return revealed Gonzalez Cruz used a similar shipping scheme as John Marin for 22 FedEx parcels sent between August 23, 2022, and May 31, 2023. Labels were generated bearing shipper name Graciela Gonzalez at 12550 Crenshaw Blvd, Hawthorne, California to recipient name Graciela Gonzalez and recipient company name Virgo Stones & Jewelry also at 12550 Crenshaw Blvd, Hawthorne, California (some packages specify Apartment 410. Gonzalez Cruz is known to live in apartment 410 at this address. Analysis of the locations where the parcels entered the FedEx system reveals they did not originate in California, thus falsifying the label that was utilized. This pattern matches the scheme Marin utilized to ship narcotics proceeds.

### 3.  <u>Google/Gmail Records</u>

71.     Search warrants were served on Google to obtain the Gmail content for the following accounts during the limited date ranges:

   **a) bucksmke36@gmail.com (01/01/2022 – 08/01/2022) – Long**

72.     Google's search warrant response for the bucksmke36 Gmail revealed the account was associated with Antonio Long and contained 509 emails.  During the seven (7) months from 01/10/2022-07/25/2022, bucksmke36@gmail.com received seventy-six (76) emails from Wave Financial via mailer@waveapp.com.  The emails con]tained invoices from JM Time Corp / R&J Watch Co.  The emails containing the invoices were forwarded through bucksmke36@gmail.com

to CS#1's email address {fifty-five (55) invoices} and bobbyperry365@yahoo.com {nineteen (19) invoices}.

73.     During the same seven (7) months, bucksmke36@gmail.com received seventy-six (76) emails from info@shipinfosure.com, with the subject line, "A Label from R&J". The body of each email possessed the greeting "Dear John Marin" and contained a link to a premade FedEx shipping label. The emails were forwarded through bucksmke36@gmail.com to CS#1's email address {fifty-five (55) labels} and bobbyperry365@yahoo.com {twenty (20) labels}.

74.     Further analysis of the bucksmke36@gmail.com search warrant return indicated that the account was used almost exclusively to forward invoices and FedEx labels to Milwaukee-based narcotics distributors.

**b)  illdreams88@gmail.com (11/25/2021-09/29/2022) – Long**

75.     Google's search warrant response for the illdreams88 Gmail revealed the account was associated with Antonio Long and contained 11,593 emails. Between 01/21/2022-07/25/2022, illdreams88@gmail.com received fifteen (15) emails from mailer@waveapps.com, which transmitted invoices from the following businesses, which are affiliated with the accompanying persons:

    a.   "Prestige Fine Metals" (Michelle Sabra – suspected drug proceeds recipient) {eight (8) invoices},

    b.   "SB Stainless Settings" (Fernando Talley - suspected drug proceeds recipient) {three (3) invoices}, and

    c.   "Virgo Stones and Jewelry Co. (Graciela Gonzalez-Cruz) {four (4) invoices}. Thirteen (13) of these invoices were forwarded through illdreams88@gmail.com to CS#1's email address {eight (8) invoices} and bobbyperrry365@yahoo.com {five (5) invoices}.

33

76.     Between 02/22/2022-07/25/2022, illdreams88@gmail.com received thirteen (13) emails with the subject line "Label" from sbstainlesssettings@gmail.com {four (4) labels}, msabra@prestigefinemetal@gmail.com {five (5) labels}, and virgostonesjewelry@gmail.com {four (4) labels}. All emails contained a link to a FedEx label. The emails and attachments were forwarded through illdreams88@gmail.com to CS#1's email address {eight (8) labels} and bobbyperry365@gmail.com {five (5) labels}.

77.     Further analysis of the contents of illdreams88@gmail.com warrant return indicated that Antonio Long also utilized the account for personal and business use.

78.     Records obtained from Wisconsin's Department of Financial Institutions reveal the following:

   a.   NorthBay Freight, LLC was established on March 15, 2020.  Its most recent registered agent is Antonio Long's daughter, Shalyn Long.  Its current address is 2266 N. Prospect Avenue, Suite 400, Milwaukee, Wisconsin **(Subject Premises)**.

   b.   CD Express, LLC was established on March 2, 2023.  Its most recent registered agent is Antonio Long.  Its current address is 2266 N. Prospect Avenue, Suite 400, Milwaukee, Wisconsin **(Subject Premises)**

   **4.   Other Financial Records**

79.     Financial institution records were subpoenaed from multiple banks and peer-to-peer payment venues, including Zelle and CashApp, for accounts held by Marin, his business entities, and his suspected conspirators.  Those records revealed Marin's attempts to disguise the true sources of his cocaine trafficking proceeds from 2017 through 2024.

80.     Records obtained from Wells Fargo Bank reveal that Marin used his personal checking account to receive large, round-dollar currency deposits at bank locations outside of California, which proceeds were withdrawn as currency in the Los Angeles, California area.  The

34

currency deposits were often made by unknown individuals throughout the United States, including Gilbert, Arizona, Milwaukee, Wisconsin, and elsewhere. Further, the Wells Fargo Bank accounts for several of Marin's associates, including Aleman, Ferreira and Dorecia Jauregui, also began receiving large, round-dollar deposits in the same areas of the country. Those deposits were also followed with large currency withdrawals in the Los Angeles, California area, or checks made payable to John Marin were drawn against those accounts and either deposited into Marin's account or negotiated for cash. Such currency deposit and withdrawal activities indicate that Marin and his associate's accounts were being used as "funnel accounts," a popular money laundering technique used by illegal drug dealers. For example, Jauregui's Wells Fargo Bank checking account indicates that her account was used as a funnel account, receiving large currency deposits then distributing those proceeds to Marin/Marin's business, as follows:

a. $5,000 cash deposit on 03/09/2017 followed by a $4,800 check to JM Time Corp on 03/10/2017.

b. $8,700 cash deposit on 03/23/2017 followed by a $8,400 withdrawal on 03/24/2017.

c. $4,000 cash deposit on 04/25/2017, followed by a $3,900 check to John Marin on 04/28/2017.

d. $9,020 cash deposit on 05/12/2017, followed by a $8,800 check to JM Time Corp.

e. $3,500 cash deposit (Duluth, GA) on 07/13/2017, followed by a $3,300 check to John Marin on 07/14/2017.

f. $6,700 cash deposit on 07/26/2017, followed by a $6,500 check to John Marin on 07/27/2017.

g. $8,750 cash deposit on 09/06/2017, followed by a $8,600 withdrawal on 09/14/2017.

35

h. $2,700 & $8,400 (Duluth, GA) cash deposits on 09/19/2017, followed by $4,600 and $6,200 checks to John Marin on 09/19 and 09/20/2017.

i. Structured $1,500, $5,000 & $4,000 cash deposits on 10/10 and 10/11/2017, followed by a $8,800 check to JM Time Corp on 10/11/2017 and a $1,100 transfer to John Marin's account on 10/12/2017.

j. $2,100 cash deposit on 12/01/2017 and a $7,200 cash deposit (Norcross, GA) on 12/04/2017, followed by a $7,000 withdrawal on 12/05/2017.

k. $9,000 cash deposit on 12/16/2017, followed by a $8,800 check to John Marin on 12/18/2017.

81. The financial records confirmed the depositing of significant amounts of currency, but only as much as was needed to make payments to third parties who required payment by check or electronically, which I know is a common technique used by persons deriving illegal income. Much of that currency was deposited into the accounts of JM Time Corp then funneled to Marin and his family members in what I believe was an attempt to further disguise the drug proceeds as legitimate jewelry store proceeds.  For example, records for JM Time Corp's checking account #*6852 at JPMorgan Chase Bank revealed the following:

a. From May 2021 through November 2022, $807,360 in currency was deposited into JM's Time Corp.'s account.

b. Most of those currency deposits corresponded with transfers to Marin's family members, either directly or through the payment of their personal expenses. Notably,

    i. Payments (17) against Julieana Munoz's (Marin's wife) American Express credit card balances, totaling $260,649.18;

    ii. Zelle payments (6) to Julieana MUNOZ, totaling $14,800.00;

    iii. Transfers (7) to John Marin's personal checking account, totaling $31,400.00; and

iv.  Payments (3) against John Marin's Chase Bank card, totaling $25,891.44.

82.  Non-currency credits into JM Time Corp's account included the following totals from Marin's suspected illegal drug trafficking associates:

    a.  Antonio Long      $ 5,000,

    b.  Carlos Ferreira    $ 12,200,

    c.  Michael Aleman    $ 1,500, and

    d.  Ronnel Panopio    $ 42,179

83.  Records obtained from Early Warning Services, LLC, doing business as Zelle, included the profile information for Marin, which revealed his use of his JM Time Corp and R and J businesses, as follows:

    a.  Zelle Tokens Used:

        i.  JMTimeCorp@gmail.com

        ii.  RandJ15@icloud.com

        iii.  RandJWatchCo@yahoo.com

84.  Further, the Marin Zelle transactions during the period January 2021 through November 2023 included transactions with his cocaine and money laundering conspirators Long, Aleman, and Ferreira.

85.  Records obtained from CashApp regarding Marin's transactions revealed that between July 2022 and July 2024, Long successfully sent approximately 47 payments to Marin that totaled $31,700.  Prior to the search warrant at Long's residence in January 2023, Long was sending payments to Marin under the identity of Antonio Long.  After the search warrant, Long began sending the payments under the identity of NorthBay Freight, LLC, in what I believe to be an attempt to disguise the source of the funds.  The records received from CashApp covered the

37

period from July 2022 through July 2024. The last payment from NorthBay Freight was July 23, 2024.

86. Bank records obtained on September 17, 2024, from BMO Bank indicate that Long has three business accounts open; NorthBay Freight LLC checking #*3133, NorthBay Freight LLC credit line #*5167, and CD Express LLC checking #*3885. The address appearing on the documents associated with all three accounts is 2266 N Prospect Avenue #400, Milwaukee, Wisconsin **(Subject Premises)**. The signer on all three accounts is Antonio Long. The NorthBay Freight checking account's signature card was signed in Antonio Long's name on April 7, 2023. One month later, the first CashApp payment to John Marin was made. Additional CashApp payments to John Marin were drawn from the NorthBay Freight checking account, as revealed by Marin's CashApp records, as follows:

| Date | Time | Status | Total | Subject | Sender | Action | Recipient |
|---|---|---|---|---|---|---|---|
| 7/1/2022 | 17:31:18 | PAID_OUT | $2,500.00 | | Antonio Long | Paying | John M |
| 10/17/2022 | 16:05:00 | PAID_OUT | $2,000.00 | payroll | Antonio Long | Paying | John M |
| 10/27/2022 | 14:43:04 | PAID_OUT | $2,000.00 | payroll | Antonio Long | Paying | John M |
| 11/18/2022 | 21:11:53 | PAID_OUT | $2,000.00 | payroll | Antonio Long | Paying | John M |
| 5/26/2023 | 22:10:11 | PAID_OUT | $600.00 | | NorthBay Freight | Paying | John M |
| 6/2/2023 | 16:29:02 | PAID_OUT | $600.00 | | NorthBay Freight | Paying | John M |
| 6/2/2023 | 16:29:15 | PAID_OUT | $600.00 | | NorthBay Freight | Paying | John M |
| 6/10/2023 | 20:14:45 | PAID_OUT | $600.00 | I'm broke | NorthBay Freight | Paying | John M |
| 6/23/2023 | 16:16:57 | PAID_OUT | $600.00 | | NorthBay Freight | Paying | John M |
| 6/23/2023 | 16:17:13 | PAID_OUT | $400.00 | | NorthBay Freight | Paying | John M |
| 6/30/2023 | 19:33:07 | PAID_OUT | $500.00 | payroll | NorthBay Freight | Paying | John M |
| 7/21/2023 | 21:31:22 | PAID_OUT | $600.00 | | NorthBay Freight | Paying | John M |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 9/8/2023 | 14:34:17 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 9/22/2023 | 18:39:05 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 10/7/2023 | 20:59:13 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 10/20/2023 | 19:20:04 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 11/3/2023 | 22:57:51 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 11/17/2023 | 21:17:42 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 12/1/2023 | 18:01:44 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 12/8/2023 | 20:55:44 | PAID_OUT | $750.00 | | NorthBay Freight | Paying | John M |
| 12/8/2023 | 20:55:55 | PAID_OUT | $750.00 | | NorthBay Freight | Paying | John M |
| 12/9/2023 | 21:02:31 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 12/9/2023 | 21:02:42 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 12/15/2023 | 21:24:29 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 12/29/2023 | 22:13:30 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 1/19/2024 | 20:22:36 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 1/26/2024 | 22:43:41 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 2/14/2024 | 0:03:26 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 2/26/2024 | 20:35:00 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 3/1/2024 | 22:11:26 | PAID_OUT | $700.00 | | NorthBay Freight | Paying | John M |
| 3/1/2024 | 22:11:39 | PAID_OUT | $700.00 | | NorthBay Freight | Paying | John M |
| 3/14/2024 | 19:07:21 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 3/26/2024 | 3:04:25 | PAID_OUT | $300.00 | | NorthBay Freight | Paying | John M |
| 4/9/2024 | 2:36:38 | PAID_OUT | $750.00 | | NorthBay Freight | Paying | John M |
| 4/9/2024 | 15:45:38 | PAID_OUT | $750.00 | | NorthBay Freight | Paying | John M |
| 5/3/2024 | 23:17:31 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 5/3/2024 | 23:17:41 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |

39

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 5/23/2024 | 21:56:25 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 5/23/2024 | 21:56:37 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 6/23/2024 | 13:22:40 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 7/3/2024 | 1:06:41 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 7/6/2024 | 21:31:00 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| 7/6/2024 | 21:31:19 | PAID_OUT | $500.00 | marketing | NorthBay Freight | Paying | John M |
| 7/13/2024 | 13:39:39 | PAID_OUT | $750.00 | | NorthBay Freight | Paying | John M |
| 7/13/2024 | 13:39:52 | PAID_OUT | $750.00 | | NorthBay Freight | Paying | John M |
| 7/13/2024 | 13:40:11 | PAID_OUT | $500.00 | | NorthBay Freight | Paying | John M |
| | | $31,700.00 | Total "Paid-Out" | | | | |

87.     Based upon these records, and Long's prior admissions that he had a substantial drug debt that he owed to Marin and that he would make periodic payments based upon his available funds, I believe that Long continued to pay Marin related to their prior drug transactions even after the execution of a federal search warrant at Long's residence and Long is using NorthBay Freight, LLC's assets (financial accounts) to hide his identity and disguise the purpose of the payments, in violation of the aforementioned federal money laundering laws.  Based upon the records, Long made what I believe to be a payment to Marin towards the drug debt as recently as July 2024, which were the last records subpoenaed from CashApp and did so using NorthBay Freight as the sender account.

88.     As detailed above, case agents conducted physical surveillance of the **Subject Premises** as recently as November 2024 and determined that it appears to still be operating as NorthBay Freight based upon the door insignia. Case agents believe that evidence of the above-listed offenses will be found at the **Subject Premises** because I believe that Antonio Long is still

40

Case 2:24-mj-00537-SCD    Filed 11/19/24    Page 49 of 63    Document 1

providing payments for narcotics to John Marin by utilizing the Northbay Freight business account. As detailed above, when interviewed in January 2023, Long admitted to owing Marin approximately $250,000 for prior drug shipments and to using CashApp to send Marin money whenever Long was able. As detailed in the chart in paragraph 91 above, Long and/or NorthBay Freight have sent Marin less than $32,000 since July 2022 (and less than $25,000 since the January 2023 interview). I believe this shows that Long still owed a significant amount of debt to Marin for prior drug shipments after July 2024, and that records and other evidence of Long's drug trafficking and money laundering will be located at NorthBay Freight's business offices (**Subject Premises**). This includes evidence showing there is no legitimate business between Long and Marin involving NorthBay Freight's trucking services to justify the CashApp, etc., payments.

89.     Further, I know that CashApp and similar payments are made electronically by use of cellular devices and other electronic devices. Suspected CashApp payments for narcotics were made as recently as July 2024 by NorthBay Freight account name to John Marin. Case agents believe there are records maintained physically and electronically at the SUBJECT PREMISES that will show Antonio Long's involvement in the subject offenses.

## IV.     REQUEST FOR SEALING

90.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court. These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation. Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation, including by giving targets an opportunity to destroy or tamper with evidence, change patterns of behavior, notify confederates, and flee from prosecution.

## V.     TRAINING AND EXPERIENCE RELATED TO ITEMS TO BE SEIZED

91.     Based on my training and experience and knowledge of this case, I believe that digital devices belonging to Long, Humphries, Marin, Munoz, Arriaga-Diaz, Ponce, Lomeli, Aleman, Gonzalez Cruz, and their co-conspirators likely contain additional locational and other data linking the co-conspirators to the Subject Offenses.

92.     Drug traffickers commonly keep large sums of currency, financial instruments, precious metals, jewelry, and other items of value which represent either the proceeds from drug sales or are intended for the purchase of controlled substances.  Drug traffickers often maintain on hand large amounts of United States currency in order to maintain and finance their ongoing drug trafficking businesses, which operate on a cash basis.  Such currency is often stored in their residences or other locations under their control. To manage, consolidate, store, transport, and otherwise handle such currency, drug traffickers utilize items including money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines.

93.     When drug traffickers amass such wealth, they often attempt to legitimize that wealth or otherwise conceal it and its origin from discovery by law enforcement.  To accomplish this, drug traffickers often use different techniques, including the use of digital currency, foreign and domestic banks and their attendant services, including savings and checking accounts, securities, cashier's checks, money drafts and letters of credit to exchange drug proceeds into money that appears to come from a legitimate source.  In my training an experience, amounts of currency (cash) over $2,000 connected to a known drug trafficker, including in locations under their control, are likely to be connected to drug trafficking activities.

42

94.     They also establish shell corporations and business fronts that they use to launder drug proceeds.  Drug traffickers often use wire transfers, cashier's checks, and money orders to pay for drugs or other costs relating to their distribution business.  Drug traffickers often keep these items of value, and records relating to them, on their person or in their residences and/or locations under their control where they are concealed from law enforcement and readily available.

95.     Drug traffickers go to great lengths to hide and secure the drugs, drug proceeds, other items of value and records relating to their drug business.  This is to safeguard those items against robbery and keep them from law enforcement.  These secure locations typically include safes, vaults, or other locked containers.

96.     Drug traffickers often use the United States Postal Service or commercial express mail delivery companies, such as FedEx or UPS, to ship drugs and money to various points within the United States.  They do so, at least in part, due to the convenience of the service and the availability of related internet and phone tracking services, speed of delivery, and to reduce their risk of arrest during the transportation of drugs from one place to another.  Drug traffickers frequently maintain records relating to their use of these services, such as receipts, copies of shipping labels or payment information, packing tape, packing popcorn/filler and other packaging materials, and package tracking records printed from the internet, at their residences, stash houses, and/or other locations under their control where they are available for reference.

97.     Drug traffickers frequently take, or cause to be taken, photographs and/or videos of themselves, their criminal associates, their real and personal property, their weapons, and their drugs.

98.     They often use electronic devices such as cellular telephones -- using digital communications applications such as iMessage, WhatsApp, Signal, Telegram and the like, satellite

telephones, text messaging devices, telephone calling cards, computers, email, simple and often prepaid phones, known colloquially as "drop phones," in order to communicate with their suppliers, customers, transporters, and others involved in their illicit drug distribution activities by phone, text message, or email. Drug traffickers often keep the records listed above on those devices. Drug traffickers often use multiple phones, including not only their own phones but also phones of family members or significant others in order to avoid detection by law enforcement. Drug traffickers often keep these devices in their residences, stash houses, businesses, and/or vehicles where they are readily available.

99.    From my training and experience, I know that individuals engaged in illegal income producing activities seek to conceal that income. In particular, individuals engaged in drug trafficking often receive payment in cash and engage in money laundering activities in order to conceal the source of their illicit proceeds. Drug traffickers often purchase expensive items such as jewelry, gold, and silver to conceal their receipt of large amounts of cash.

100.    Individuals who amass proceeds from illegal activities routinely attempt to further that conduct and/or conceal the existence and source of their funds by engaging in financial transactions with domestic and foreign institutions, and others, through all manner of financial instruments, including cash, cashier's checks, money drafts, traveler's checks, wire transfers, money orders, etc. I know from personal knowledge that individuals attempting to conceal income from the government often use a variety of methods to conceal the income including creating false business entities, in order to disguise and conceal income.

101.    Based on my training and experience, I also know that those involved in money laundering and the other Subject Offenses usually keep transaction records and other evidence related to their criminal activity at their place of business, residences, and on their persons,

44

including their digital devices.  Notably, those involved in the Subject Offenses generally maintain and use numerous digital devices and keep those devices at their homes, businesses, and on their persons.

## VI.    __TRAINING AND EXPERIENCE ON DIGITAL DEVICES3__

102.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That

---

[3] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

45

evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

103. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of

digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

104. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

## VII. CONCLUSION

149. Based on the evidence described above, your affiant believes there is probable cause to believe the following:

    a. Antonio Long conspired with John Marin to deliver large quantities of cocaine to distributors in the Milwaukee, Wisconsin area during the years 2017 through at least 2022.

    b. Antonio Long owed John Marin a drug debt of more than $250,000 at the time a federal search warrant was executed at Long's Gilbert, Arizona residence in January 2023.

    c. NorthBay Freight, LLC was established in the state of Wisconsin in March 2020 and the current registered agent for that business is Antonio Long's daughter. Financial accounts were opened by Antonio Long in the name of NorthBay Freight, LLC in April 2023. The address listed for NorthBay Freight, LLC on records obtained from both the State of Wisconsin's Department of Financial Institutions and BMO Bank list NorthBay Freight, LLC's address as 2266 N Prospect Avenue #400, Milwaukee, Wisconsin **(Subject Premises)**

    d. Financial documents reveal the following:

        i. John Marin possesses documents related to NorthBay Freight, LLC that indicate he is the actual owner of the company and Antonio Long is an employee; and

47

ii. Prior to the execution of a search warrant at Antonio Long's residence in January 2023 Antonio Long made drug payments to John Marin from accounts bearing his personal name; however, after January 2023, Long began making payments against what case agents believe to be Long's drug debt to Marin from accounts bearing the name of NorthBay Freight, LLC, that Long controlled, for the purpose of disguising the source and purpose of those payments, in violation of federal money laundering laws.

150. Based on the above information and facts, your Affiant submits there is probable cause to believe that located at and in the property described in Attachment A, there is evidence, fruits, and instrumentalities of drug trafficking violations under Title 21, United States Code, Sections 846, 841(a)(1), and 843(b), money laundering violations under Title 18, United States Code, Sections 1956 (a)(1)(B)(i), 1956(h), and 1957; and Bank Secrecy Act violations under Title 31, United States Code, Section 5331, and proceeds of these offenses, all of which is detailed more specifically in Attachment B, Items to be Seized.

48

## ATTACHMENT A-1

### *PROPERTY/PREMISES TO BE SEARCHED*

The premises located at 2266 N Prospect Avenue, Suite 400, Milwaukee, Wisconsin 53202 (**Subject Premises**).  **Subject Premises** is a single unit within a multi-story business located on the southeast corner of N Prospect Avenue.  The numbers "2266" are affixed in a horizontal fashion in bold white numbers across the top of the main entrance facing N Prospect Avenue.  The exterior of the building is described as having a tan stone and brick finish with three windows on each floor facing north side of the business.  The south side of the building has a parking structure attached to the building.  The main entrance to the business is facing N Prospect Avenue and has a glass front with two glass doors.  The numbers "2266" are affixed in a horizontal fashion in bold white numbers above the main entrance.  Suite number 400 is located on the fourth floor of 2266 N Prospect Avenue, on the east side of the building, the suite faces Prospect Avenue.  The entrance to Suite 400 is a wooden door with a black frame, there is a white placard affixed next to the door with the numbers "400" and an additional placard affixed to the wooden door which reads Northbay Freight. The business is located in the City of Milwaukee, County of Milwaukee, State of Wisconsin; **SUBJECT PREMISES** includes all, storage facilities, outbuildings and garages within the curtilage of the **SUBJECT PREMISES**. Areas in **SUBJECT PREMISES** to be searched include all rooms, areas behind false walls, containers, and safes.

 

1

**ATTACHMENT B**

**_ITEMS TO BE SEIZED_**

1.      All records, documents, evidence, and information on the premises or on any cellphones, computers, electronic devices, and storage devices containing evidence of or used as a means to commit violations of  21 U.S.C. § 841(a)(1) (possession with intent to distribute and distribution of cocaine), 21 U.S.C. § 846 (conspiracy to possess with intent to distribute and distribution of cocaine), 21 U.S.C. § 843(b) (unlawful use of a communication facility to facilitate distribution of cocaine), 18 U.S.C. § 1956 and 1957 (money laundering), 18 U.S.C. § 1956(h) (money laundering conspiracy), and 31 U.S.C. § 5331 (failure to file Form 8300, Reports of Cash Payments Over $10,000 Received in a Trade or Business) (the "Subject Offenses"), namely:

a.  Items and paraphernalia for the manufacturing, distributing, packaging, sale, or weighing of controlled substances;

b.  Items used in the packaging of currency for consolidation and transportation, such as money-counting machines, money wrappers, carbon paper, rubber bands, duct tape or wrapping tape, plastic wrap or shrink wrap, and plastic sealing machines;

c.  Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply of controlled substances or firearms, or drug or firearms customers, including calendars, address books, telephone or other contact lists, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and/or times when drugs, guns, or ammunition, were bought, sold, or otherwise distributed, whether contained in hard copy correspondence, notes, emails, text messages, photographs, videos (including items stored on digital devices), or otherwise;

d.  Books, records, correspondence, ledgers, logs, journals, accounts payable and receivable, pay-owe sheets, contracts, letters and memoranda of agreements between potential co-conspirators, formulas, receipts, phone records, phone books, address books, notations and

1

other papers, and any files relating to the transmission and exchange of cryptocurrency and/or other monetary instruments;

e. Indicia of occupancy, residency, and/or ownership of the previously described property, premises, or vehicles, including utility and telephone bills, canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, envelopes, registration, receipts, and keys which tend to show the identities of the occupants, residents, and/or owners;

f. Records concerning the use of commercial mail receiving agencies and/or post office boxes;

g. Financial records, including bank statements, bank receipts, passbooks, bank checks, money market or similar accounts, money drafts, letters of credit, payroll documents, employer information, income and expense records, Federal and State income tax returns, money orders, cashier's checks, loan applications, credit card records, safe deposit box and records, acquisitions, notes, and records reflecting vehicles, aircraft or vessels owned, purchased, sold or leased;

h. United States currency, and records relating to income derived from money laundering and expenditures of money and wealth, for example, money orders, wire transfers, cashier's checks and receipts, passbooks, cash cards, gift cards, checkbooks, check registers, securities, precious metals, jewelry, antique or modem automobiles, bank statements and other financial instruments, including stocks or bonds in amounts indicative of money laundering;

i. Proceeds of drug trafficking activities, such as currency, crypto currency, precious metals, financial instruments, jewelry, and documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry, or other items obtained with the proceeds of drug trafficking activities;

j. Storage units and containers, such as floor safes, wall safes, upright safes (also known as gun safes), lock boxes, and other self-contained locked enclosures;

2

k. Documents indicating travel in interstate and foreign commerce to meet with clients and/or co-conspirators, such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills;

l. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

2.     With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

a. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted;

b. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment of other devices;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e. evidence of the times the device was used;

f. applications, programs, software, documentation, manuals, passwords, keys, and other access devices that may be necessary to access the device or data stored on the device, to run software contained on the device, or to conduct a forensic examination of the device;

g. records of or information about Internet Protocol addresses used by the device.

3.     As used herein, the terms "records," "information," "documents," "programs," "applications," and "materials" include records, information, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3

4.     As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

During the execution of the search of the person described in Attachment A, law enforcement personnel are authorized to obtain from Antonio Long, Shalyn Long, and/or Stephen Humphries, the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock the a digital device, to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition, for the purpose of attempting to unlock the Device's security features in order to search the contents as authorized by this warrant.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably practicable. If the government identifies any seized communications that may implicate the

4

attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review.

This warrant authorizes a review of electronic storage media and electronically stored information seized or copied pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, case agents may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.